IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

MEGATEL HOMES, LLC and §
CIPRIANI ISLAND LAGUNA §
AZURE LLC, §
§
Plaintiffs, §
§
V. § No. 3:24-cv-2295-L
§
CITY OF MANSFIELD, TEXAS, §
§
Defendant. §

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION OF THE
UNITED STATES MAGISTRATE JUDGE**

Defendant City of Mansfield, Texas moved to dismiss Plaintiffs Megatel

Homes, LLC and Cipriani Island Laguna Azure LLC's complaint under Federal Rules

of Civil Procedure 12(b)(1) and 12(b)(6). *See* Dkt. No. 7.

Under 28 U.S.C. § 636(b), United States District Judge Sam A. Lindsay

referred the City's motion to dismiss to the undersigned United States magistrate

judge for hearing, if necessary, and to submit proposed findings and

recommendations as to its disposition. *See* Dkt. No. 8.

Plaintiffs responded, and the City replied. *See* Dkt. Nos. 9, 12, & 13.

For the reasons and to the extent set out below, the undersigned recommends

that the Court grant the motion in part and deny it in part.

**Discussion**

Related to their efforts to develop land in Johnson County, Texas, Plaintiffs

brings claims against the City under Sections 1 and 2 of the Sherman Act, 15 U.S.C.

§§ 1 & 2, and Texas law, for the City's alleged "tortious interference with Plaintiffs' rights to obtain retail water utility services from Johnson County Special Utility District ('JCSUD') and other actionable misrepresentations," Dkt. No. 1, ¶ 1. According to Plaintiffs, "Defendant took these actions to prevent Plaintiffs from developing their property, by denying Plaintiffs' access to water utility services unless Plaintiffs acquiesced to Mansfield's unlawful demands for financial benefits that it has no right to impose." *Id.*

The City moves to dismiss this lawsuit for lack of subject-matter jurisdiction under Rule 12(b)(1), arguing primarily that Plaintiffs' claims are not ripe, so they lack Article III standing.

And, if the Court disagrees and finds that it does have subject-matter jurisdiction over this lawsuit, the City moves to dismiss Plaintiffs' claims under Rule 12(b)(6) because 1) the antitrust claims falter due to the state-action immunity doctrine and their not being compatible with what is essentially a contract dispute and 2) the state law intentional tort claims are barred by immunity.

The City also argues that, if the Court finds that the federal law causes of action should be dismissed, the Court should decline supplemental jurisdiction over the remaining claims.

I.  The Court should deny the City's Rule 12(b)(1) request to dismiss for lack of <u>subject-matter jurisdiction.</u>

Plaintiffs invoke the Court's subject-matter jurisdiction under 28 U.S.C. § 1331 based on the presence of the Sherman Act counts.

And Section 1331, as an "independent basis of subject matter jurisdiction"

allows for supplemental jurisdiction under 28 U.S.C. § 1367 for the state law claims. *Atkins v. Propst*, No. 22-10609, 2023 WL 2658852, at *2 (5th Cir. Mar. 28, 2023) (per curiam) (citing *Arena v. Graybar Elec. Co., Inc.*, 669 F.3d 214 (5th Cir. 2012)).

But, where that basis for subject matter jurisdiction drops out, a court may choose to decline to exercise supplemental jurisdiction over the remaining state law claims. *See* 28 U.S.C. § 1367(c); *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988); *Enochs v. Lampasas Cnty.*, 641 F.3d 155, 158-59 (5th Cir. 2011).

Likewise, "declaratory relief under [28 U.S.C.] § 2201 is appropriate only when there exists an independent basis for jurisdiction." *Parham v. Clinton*, 374 F. App'x 503, 504 (5th Cir. 2010) (per curiam) (citing *Simi Inv. Co. v. Harris Cnty., Tex.*, 236 F.3d 240, 247 (5th Cir. 2000) ("Declaratory Judgment Act claims, without another basis for jurisdiction, cannot support the district court's jurisdiction." (citation omitted))).

Subject-matter jurisdiction under Section 1331 typically "exists when 'a well-pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law.'" *Borden v. Allstate Ins. Co.*, 589 F.3d 168, 172 (5th Cir. 2009) (quoting *Franchise Tax Bd. v. Constr. Laborers Vacation Tr.*, 463 U.S. 1, 27-28 (1983)); *see also In re Hot-Hed Inc.*, 477 F.3d 320, 323 (5th Cir. 2007) ("A federal question exists 'if there appears on the face of the complaint some substantial, disputed question of federal law.'" (quoting *Carpenter v. Wichita Falls Indep. Sch. Dist.*, 44 F.3d 362, 366 (5th Cir. 1995))).

- 3 -

And, under Section 1331, "when a federal claim appears on the face of the complaint, dismissal for lack of subject matter jurisdiction is only proper in the case of a frivolous or insubstantial claim, i.e., a claim which has no plausible foundation or which is clearly foreclosed by a prior [United States] Supreme Court decision." *Copeland v. E\*Trade Cap. Mgmt., L.L.C.*, No. 24-10658, 2025 WL 66732, at \*2 (5th Cir. Jan. 10, 2025) (per curiam) (cleaned up; quoting *Young v. Hosemann*, 598 F.3d 184, 188 (5th Cir. 2010) (quoting *Bell v. Health-Mor, Inc.*, 549 F.2d 342, 344 (5th Cir. 1977))).

"But compliance with § 1331 is necessary but not sufficient for federal subject matter jurisdiction." *Lutostanski v. Brown*, 88 F.4th 582, 588 (5th Cir. 2023). That is because "plaintiffs must also show that they have Article III standing." *Id.* (citing *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 103-04 (1998)). So, if "plaintiffs lack standing, the district court lacks subject matter jurisdiction." *Id.*

As such, "[t]he doctrine of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." *Hopkins v. Hosemann*, 76 F.4th 378, 392 (5th Cir. 2023) (cleaned up).

To obtain "Article III standing, a plaintiff must allege that it has been injured, that the defendant caused the injury, and that the requested relief will redress the injury." *Cotton v. Certain Underwriters at Lloyd's of London*, 831 F.3d 592, 595 (5th Cir. 2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)).

So "[t]he question of standing is fundamentally about the propriety of an individual to litigate a claim irrespective of its legal merits." *West v. City of Santa Fe,*

*Tex.*, No. 3:16-CV-0309, 2018 WL 4047115, at *11 (S.D. Tex. Aug. 16, 2018) (citing *Warth v. Seldin*, 422 U.S. 490, 498 (1975)), *rec. adopted*, 2018 WL 5276264 (S.D. Tex. Sept. 19, 2018).

And, so, courts should proceed cautiously where standing arguments brought under Rule 12(b)(1) may not implicate the constitutional requirements for standing (and thus the Court's subject matter jurisdiction) but rather should, if applicable, be considered under Rule 12(b)(6). *Cf. Maxim Crane Works, L.P. v. Zurich Am. Ins. Co.*, 11 F.4th 345, 350 (5th Cir. 2021) ("Zurich argues that Maxim does not have a contractual right to bring this suit. And such questions do not go to the court's subject matter jurisdiction but are instead part of the inquiry into the merits of a particular claim. Unlike a dismissal for lack of constitutional standing, which should be granted under Rule 12(b)(1), a dismissal for lack of prudential or statutory standing is properly granted under Rule 12(b)(6)." (cleaned up)).

Relatedly, Plaintiffs do assert that "[t]he City appears to conflate its ripeness argument with the concept of standing." *E.g.*, Dkt. No. 12 at 20 n.66.

But ripeness can implicate Article III standing and the Court's subject-matter jurisdiction where "[t]he ripeness inquiry reflects Article III limitations on judicial power as well as prudential reasons for refusing to exercise jurisdiction." *DM Arbor Court, Ltd. v. City of Hous.*, 988 F.3d 215, 218 (5th Cir. 2021) (cleaned up); *accord Urban Developers LLC v. City of Jackson*, 468 F.3d 281, 292 (5th Cir. 2006) ("Ripeness is a question of law that implicates this court's subject matter jurisdiction." (citations omitted)).

That is, "[c]onstitutional ripeness refers to Article III's case-or-controversy requirement, which mandates that an 'actual controversy' exist between the parties 'at all stages of review' in federal court." *DM Arbor Court*, 988 F.3d at 218 n.1 (cleaned up); *accord Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 579 (1985) ("As a threshold matter, we must determine whether appellees' Article III claims demonstrate sufficient ripeness to establish a concrete case or controversy." (citation omitted)).

And, "[e]ven when constitutional ripeness is satisfied" – such that there is Article III standing and subject-matter jurisdiction – "a court [still] may decide not to hear a case for prudential reasons, such as problems of prematurity and abstractness." *DM Arbor Court*, 988 F.3d at 218 n.1 (cleaned up); *cf. Weekly v. Morrow*, 204 F.3d 613, 614-15 (5th Cir. 2000) ("Federal courts do not abstain … because they lack jurisdiction; rather, [ ] abstention reflects a court's prudential decision not to exercise equity jurisdiction which it in fact possesses." (cleaned up)).

The gist of the City's constitutional ripeness argument is that dismissal under Rule 12(b)(1) is required because, "[s]ince Plaintiffs have never sought water service from the City without seeking additional benefits from the City, and Plaintiffs have certainly not brought a request for water service to the City's final decisionmaker – city council – Plaintiffs fail to present a ripe claim based on alleged 'denial' of water service." Dkt. No. 7 at 10 (cleaned up).

And, as the City put it on reply,

[d]espite this clear test for a ripe claim, and perhaps in an effort to confuse a simple issue, Plaintiffs submitted over 60 pages of background

- 6 -

materials. Yet, none of those materials even suggest, let alone establish, that Plaintiffs made a proper request for water service which was rejected by the City Council, sufficient to confer standing for Plaintiffs' claims. The contractual provision of which Plaintiffs complain is clear:

> Johnson County Special Utility District will not engage in the retail or wholesale provision of water within the boundaries of Mansfield's [extraterritorial jurisdiction] … unless [JCSUD] secures the prior written consent of Mansfield ….

(Afzaliour Decl. Ex. D at p. 3.) Procedurally, Plaintiffs were required to make a stand-alone request for water service from JCSUD, untethered to any other contractual terms, including various financial incentives and development plans Plaintiffs wanted. Then, JCSUD needed to request Mansfield's consent to provide water service – and just water service – to Plaintiffs, which request would have to be rejected by the City Council to constitute final action by the City. Nothing at all in the 63 pages of Plaintiffs' materials evidence such a request or the City Council's rejection.

Dkt. No. 13 at 7.

Most of the cases that the City cites to support this understanding of constitutional ripeness involved claims under the Fifth Amendment's Takings Clause. *See* Dkt. No. 7 at 10 (citing *Urban Developers*, 468 F.3d at 294; *Hidden Oaks Ltd. v. City of Austin*, 138 F.3d 1036, 1041-42 (5th Cir. 1998); *DM Arbor Court*, 988 F.3d at 219).

"A regulatory takings claim is not ripe until the government has reached a final decision on the challenged regulation." *DM Arbor Court*, 988 F.3d at 218 (citing *Williamson Cnty. Reg'l Plan Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186 (1985), *overruled on other grounds by Knick v. Twp. of Scott*, 588 U.S. 180 (2019)).

And, while "*Knick* overruled *Williamson County*'s requirement that a property owner first litigate a takings claim in state court," "it did not alter the requirement

for a final decision from the regulator before any litigation is commenced." *DM Arbor Court*, 988 F.3d at 218 n.2.

Under this remaining requirement, "[o]nly after the final regulatory decision will a court have before it the facts necessary to evaluate a regulatory takings claim, such as the economic impact of the challenged action and the extent to which it interferes with reasonable investment-backed expectations." *Id.* at 218 (cleaned up). And, "[w]hen similar factual development is necessary for related claims[,] then those claims are also not ripe until the regulator has made a final decision. *Id.* at 218-19 (cleaned up).

But Plaintiffs do not assert a takings claim. So it is not clear that the City's jurisdictional ripeness argument has purchase.

As the United States Court of Appeals for the Fifth Circuit recently explained, where a municipality defendant's "caselaw … primarily invoke[d] the ripeness standard involved in takings cases,"

> we do not look to its presented ripeness test outside a takings claim. *See Monk v. Huston*, 340 F.3d 279, 282 (5th Cir. 2003). Without that test, the city merely states that Crown Castle was required to ask for a variance for rejected petitions, submit petitions for every other node despite the poor success rate, and change the design of its nodes to comply with the city's requirements. Those theories are divorced from caselaw and resemble exhaustion requirements more than ripeness requirements.

*Crown Castle Fiber, L.L.C. v. City of Pasadena, Tex.*, 76 F.4th 425, 437 (5th Cir. 2023) (footnote omitted); *accord Monk*, 340 F.3d at 282 ("In *Hidden Oaks*, 138 F.3d at 1045 n.6, we held that procedural due process claims not arising from or ancillary to a takings claim are not subject to the ripeness constraints set forth in *Williamson.*

- 8 -

Because the instant plaintiffs have not asserted a takings claim, the ripeness test articulated in *Williamson County* … does not control." (cleaned up)).

And, because *Williamson County*'s ripeness test does not control, the Court should "go back to first principles to decide ripeness." *Crown Castle*, 76 F.4th at 437.

Under this approach, courts "review two factors to determine ripeness: 'the fitness of the issues for judicial decision' and 'the hardship to the parties of withholding court consideration.'" *Id.* at 436 (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977)).

> A claim is "fit for judicial decision if it presents a pure question of law that needs no further factual development." *Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914, 930 (5th Cir. 2023) An unripe claim is "contingent on future events that may not occur as anticipated, or indeed may not occur at all." *Id.* at 930-31 (quoting *Thomas*, 473 U.S. at 580-81).

*Id.* (cleaned up).

And, "[w]here case is fit for judicial resolution and [ ] there is ongoing harm," "[n]othing more is required." *Id.*

Here, ongoing hardship appears evident based on the parties' submissions. And Plaintiffs' claims present legal questions that do not require further factual development.

Plaintiffs' complaint seeks a declaration that the City's conduct violates the Sherman Act and, more specifically, that the applicable water agreement between the City and JCSUD "is illegal and void to the extent that it purports to grant Mansfield a right to veto the provision of water services to Plaintiffs and others within the JCSUD service area in the City's [extraterritorial jurisdiction or "ETJ"]." Dkt. No.

1, ¶ 95. *Compare id.*, *with Tex. Midstream Gas Servs., L.L.C. v. City of Grand Prairie*, No. 3:08-cv-1724-D, 2008 WL 5000038, at *3 (N.D. Tex. Nov. 25, 2008) (In *Monk*, where the Fifth Circuit found that the claims were not ripe for adjudication, the Court of Appeals "reasoned that the landowners would suffer no deprivation of property unless and until the Texas Commission on Environmental Quality ("TCEQ")] issued the permit. Because constitutional procedural protections applied only to a deprivation of life, liberty, or property, and not in the abstract, the landowners' claim remained 'hypothetical.' The TCEQ would not run afoul of the Constitution until it rendered a permitting decision. By contrast, in the present case, [Plaintiff] argues that the City is violating the Constitution, and federal and state law, merely by requiring a permit under § 10. [Plaintiff] will still have claims even if it conforms its conduct to comply with § 10 and receives the required [specific use permit]." (citation omitted)).

In sum, Plaintiffs' claims are ripe; they have Article III standing; and they allege more than a frivolous or insubstantial claim that the City violated federal law.

The Court therefore possesses subject-matter jurisdiction and should deny the City's request for dismissal under Rule 12(b)(1).

II. **The Court should grant the City's motion under Rule 12(b)(6) to the extent that it should dismiss the Sherman Act claims based on state-action immunity and <u>then decline supplemental jurisdiction over the remaining state law claims.</u>**

"The Sherman Act forbids unreasonable restraints of trade." *Spec's Family Partners, Ltd. v. Nettles*, 972 F.3d 671, 681 (5th Cir. 2020) (citing *Ohio v. Am. Express Co.*, 585 U.S. 529, 539 (2018); 15 U.S.C. § 1). And, while

"Section 1 of the Sherman Antitrust Act makes unlawful '[e]very

contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations,' … Section 2 bans attempts to monopolize or monopolization of 'any part of the trade or commerce among the several States.' Unlike Section 1, Section 2 'covers both concerted and independent action.' But monopolization is harder to establish than the mere restraint of trade that suffices in the Section 1 context."

*BRFHH Shreveport, LLC v. Willis-Knighton Med. Ctr.*, 49 F.4th 520, 525, 528-29 (5th Cir. 2022) (citations omitted); *accord Elite Rodeo Ass'n v. Prof'l Rodeo Cowboys Ass'n, Inc.*, 159 F. Supp. 3d 738, 748, 750 (N.D. Tex. 2016).

But, "in *Parker v. Brown*, 317 U.S. 341 (1943), the Supreme Court recognized that the Sherman Act was not intended 'to restrain a state or its officers or agents from activities directed by its legislature.'" *Spec's*, 972 F.3d at 681 (quoting *Parker*, 317 U.S. at 350-51). That is, "activity prohibited by the Sherman Act does not encompass the legitimate exercise of police power by the several states." *Ctr. Ambulance Serv., Inc. v. City of Dall.*, 631 F. Supp. 366, 367 (N.D. Tex. 1986) (citing *Parker*, 317 U.S. at 352).

As such, "[t]he exemption created by the *Parker* Court is a doctrine of federalism; it is premised on the proposition that the State should be free to replace competition with regulation or public ownership without incurring antitrust liability." *Id.* (cleaned up); *accord Earles v. State Bd. of Certified Pub. Accountants of La.*, 139 F.3d 1033, 1040 (5th Cir. 1998) ("The [*Parker*] Court expressly rested its analysis on federalism principles.").

And, so, "exercises of the State's sovereign power are immune from antitrust scrutiny, and state legislation and decisions of a state supreme court, acting legislatively rather than judicially *ipso facto* are exempt from the operation of the

antitrust laws." *Spec's*, 972 F.3d at 681-82 (cleaned up; quoting *N. Carolina State Bd. of Dental Examiners v. FTC*, 574 U.S. 494, 504 (2015)).

In addition to "*[i]pso facto Parker* immunity," "acts of a prototypical state agency or municipality are entitled to immunity if pursuant to a clearly articulated and affirmatively expressed state policy to replace competition with regulation" and "actions by private parties or state agencies controlled by participants in the market they regulate are protected if they meet the aforementioned clear articulation requirement and are also subject to active supervision by the state." *Quadvest, L.P. v. San Jacinto River Auth.*, 7 F.4th 337, 346 (5th Cir. 2021) (cleaned up); *accord Spec's*, 972 F.3d at 682; *Claiborne v. Harris Cnty. Bail Bond Bd.*, 693 S.W.3d 699, 706 (Tex. App. – Houston [14th Dist.] 2024, pet. denied); *see also FTC v. Phoebe Putney Health Sys., Inc.*, 568 U.S. 216, 226 (2013) ("As with private parties, immunity will only attach to the activities of local governmental entities if they are undertaken pursuant to a clearly articulated and affirmatively expressed state policy to displace competition. But unlike private parties, such entities are not subject to the active state supervision requirement because they have less of an incentive to pursue their own self-interest under the guise of implementing state policies." (cleaned up; citing *Cmty. Commc'ns Co. v. Boulder*, 455 U.S. 40, 52 (1982); *Hallie v. Eau Claire*, 471 U.S. 34, 46-47 (1985))).

The City's assertion that the Sherman Act claims should be dismissed because it is entitled to state-action immunity is more than an affirmative defense. Like qualified immunity, where it's available, *see Stramaski v. Lawley*, 44 F.4th 318, 327

(5th Cir. 2022), "[s]tate action is properly treated as an immunity from suit," *Earles*, 139 F.3d at 1040 (footnote omitted).

Or, "more accurately," "'*Parker* immunity' is ... a strict standard for locating the reach of the Sherman Act." *Surgical Care Ctr. of Hammond, L.C. v. Hosp. Serv. Dist. No. 1 of Tangipahoa Par.*, 171 F.3d 231, 234 (5th Cir. 1999) (en banc).

And, like qualified immunity, *Parker* immunity is not jurisdictional. *See, e.g.*, *Teladoc v. Tex. Med. Bd.*, 1-15-CV-343 RP, 2015 WL 8773509, at *6 (W.D. Tex. Dec. 14, 2015).

But, while the City "bears the burden of showing it is entitled to the protection of state action immunity," *id.*, where the City has raised that immunity through a Rule 12(b)(6) motion, the Court should not defer ruling on the defense, *see, e.g.*, *Earles*, 139 F.3d at 1040 (noting that its "review of the district court's pretrial rejection of a state-action exemption [was] appropriate," citing *Hoover v. Ronwin*, 466 U.S. 558, 565-67 (1984), which the Fifth Circuit characterized as "reversing the lower court's determination that state-action immunity should not be decided on a Rule 12(b)(6) motion to dismiss"); *cf. Carswell v. Camp*, 54 F.4th 307, 311 (5th Cir. 2022) (instructing district courts that, "[w]here public officials assert qualified immunity in a motion to dismiss, [they] must rule on the motion" and "may not permit discovery against the immunity-asserting defendants before [ruling] on their defense" (citation omitted); *In re Paxton*, 60 F.4th 252, 256-58 (5th Cir. 2023) (applying *Carswell* to an assertion of sovereign immunity).

Applying the standards from *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell*

*Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), a court should grant dismissal under Rule 12(b)(6) based on state-action immunity "if, taking the well-pleaded factual allegations in the complaint as true and looking to the language of the relevant authorizing statute (and, to the extent necessary, legislative history or judicial decisions), the defendant is [ ] entitled to state-action immunity," *Quadvest*, 7 F.4th at 345-46 (citing *Earles*, 139 F.3d at 1040-44); *id.* at 345 ("State authorization is generally interpreted by an objective test that looks at the language of the statute; if other evidence is needed, it can be gleaned from legislative histories or state judicial decisions." (quoting *Hammond*, 171 F.3d at 234)).

And, as the en banc Fifth Circuit explained more than a quarter century ago, a municipality is entitled to immunity from Sherman Act claims under *Parker* "so long as it is clear from the nature of the policy articulated that the state contemplates such a displacement of competition." *Hammond*, 171 F.3d at 234.

That is, States

exercise their sovereign power in creating local entities for local government. As an incident of sovereignty, a state may govern directly or through its creatures, clothing them with the attributes and authority it chooses, including, if it desires, insulation from the Sherman Act. The Supreme Court addressed how a state accomplishes this in *Hallie*, insisting that states express their sovereign will regarding their role in the free market. The Court explained, "[T]he State may not validate a municipality's anticompetitive conduct simply by declaring it to be lawful." 471 U.S. at 39. Rather, a local entity seeking protection from the federal antitrust laws must prove "a state policy to displace competition." *Id.*

The correlative principle, and it is at the heart of this case, is that the deference due states as sovereigns resists any insistence upon a particular formula or expression, so long as it is clear from the nature of the policy articulated that the state contemplates such a displacement of competition. *Hallie* illustrates the point. The conduct at issue was

refusing to supply sewage treatment facilities outside city limits unless the outsiders agreed to be annexed to the city. *See id.* at 41. The state statute made no explicit reference to displacing competition. It was much more than a naked grant of authority to contract, however, explicitly authorizing the city to determine which areas to serve.

Similarly, in *City of Columbia v. Omni Outdoor Advertising*, 499 U.S. 365 (1991), the Supreme Court found the City immune from a charge that it had regulated billboards in an anticompetitive way. "The very purpose of zoning regulation," the Court reasoned, "is to displace unfettered business freedom in a manner that regularly has the effect of preventing normal acts of competition, particularly on the part of new entrants." *Id.* at 373.

The *Omni* Court declined to expound a clearer test for separating sufficient authorizations from insufficient ones. *See id.* at 372. *Hallie* clarified the "foreseeable result" test. The Court stated, "We think it is clear that anticompetitive effects logically would result from this broad authority to regulate." 471 U.S. at 42. The Court favorably cited its emphasis in *New Motor Vehicle Board v. Orrin W. Fox Co.*, 439 U.S. 96, 109 (1978), that the statute inherently "displace[d] unfettered business freedom." *Hallie*, 471 U.S. at 42. Thus arises a distinction between a statute that in empowering a municipality necessarily contemplates the anticompetitive activity from one that merely allows a municipality to do what other businesses can do.

*Id.* at 234-35 (cleaned up); *cf. Claiborne*, 693 S.W.3d at 707 ("Anticompetitive rules were thus a foreseeable result of the State's explicit grant of broad authority to the Board to regulate each phase of the bonding business and to adopt rules as necessary to implement the statute." (citing *Phoebe Putney*, 568 U.S. at 227; *Earles*, 139 F.3d at 1043)).

And, so, under the applicable *Parker* immunity tier, the City cannot be held liable under the Sherman Act if "a state policy to displace federal antitrust law [is] sufficiently expressed [because] the displacement of competition was the inherent, logical, or ordinary result of the exercise of authority delegated by the state legislature" and the State "fore[saw] and implicitly endorsed the anticompetitive effects as consistent with its policy goals." *Phoebe Putney*, 568 U.S. at 229; *see also,*

*e.g.*, *Quadvest*, 7 F.4th at 347-48 (affirming the district court's denial of a motion to dismiss based on state-action immunity after concluding "that the Texas Legislature did not authorize SJRA's entry into and enforcement of the challenged [groundwater reduction plan contract] provisions with the intent to displace competition in the market for wholesale raw water in Montgomery County" because "SJRA's state authorization is more akin to the enabling laws at issue in *Phoebe Putney* and *Hammond*, where the defendants were statutorily authorized to acquire hospitals and enter into contracts and joint ventures to sell hospital services, respectively, than it is similar to the legislative grants in cases finding clear articulation"; that is, "[t]he statutory powers SJRA invokes as authorizing its challenged conduct 'should be, can be, and typically are used in ways that raise no federal antitrust concerns'"; and, so, "[t]his statutory authorization lacks the indicators of monopolistic intent present in cases finding clear articulation, where the defendants were explicitly granted authority to regulate a market, such as through zoning ordinances, professional conduct rules, and the maintenance of 'fair competition'" (cleaned up)

The Texas Water Code provides the expression of state policy here.

And the Court need not spend much time to determine the clarity that it uses to express the State's policy to displace competition where the Water Code provides that "[t]he legislature finds that (1) retail public utilities are by definition monopolies in the areas they serve; (2) the normal forces of competition that operate to regulate prices in a free enterprise society do not operate for the reason stated in Subdivision (1) of this subsection; and (3) retail public utility rates, operations, and services are

regulated by public agencies, with the objective that this regulation will operate as a substitute for competition." TEX. WATER CODE § 13.001(b); *see also id.* § 13.002(19) ("'Retail public utility' means any person, corporation, public utility, water supply or sewer service corporation, municipality, public utility agency, political subdivision or agency operating, maintaining, or controlling in this state facilities for providing potable water service or sewer service, or both, for compensation.").

"Chapter 13's primary purpose is to 'establish a comprehensive regulatory system that is adequate to the task of regulating retail public utilities to assure rates, operations, and services that are just and reasonable to the consumers and to the retail public utilities.'" *City of College Station v. Wellborn Special Utility Dist.*, No. 10-04-00306-CV, 2006 WL 2067887, at *1 (Tex. App – Waco July 26, 2006, pet. denied) (quoting TEX. WATER CODE § 13.001(c)).

"To accomplish that purpose, the [Water] Code requires a retail public utility to obtain a certificate of public convenience and necessity [or "CCN"] from the [Public Utility] Commission [or "PUC"] before providing retail water or sewer utility service to an area and provides a way for the certificate to be revoked or amended. *Id.* (citing TEX. WATER CODE §§ 13.242(a) & 13.254).

That is, "Texas law authorizes the PUC to issue a [CCN] to a water utility, granting the utility the exclusive right to provide water service in a designated geographic area." *Dobbin Plantersville Water Supply Corp. v. Lake*, 108 F.4th 320, 323 (5th Cir. 2024) (citing TEX. WATER CODE §§ 13.242 & 13.244; *Tex. Gen. Land Office v. Crystal Clear Water Supply Corp.*, 449 S.W.3d 130, 133 (Tex. App. – Austin

2014, pet. denied)).

> In exchange for that right, the utility must agree to "render continuous and adequate service within the area" and to "serve every consumer." TEX. WATER CODE § 13.250(a). If the utility fails to provide "water or sewer service" to a landowner within its CCN, the landowner may, under section 13.2541 of the Water Code, "petition [the PUC] for expedited release of [its land] from" the CCN. If the petition is granted, the utility is entitled to compensation for the loss of its monopoly rights in an amount determined by an independent appraiser. *See* TEX. WATER CODE §§ 13.254(d), 13.2541 (f)-(h).

*Id.*; *see also College Station*, 2006 WL 2067887, at *1 ("Moreover, any agreement or contract between retail public utilities designating areas to be served can be valid and enforceable and incorporated into a certificate if approved by the [PUC]." (citing TEX. WATER CODE §§ 13.248 & 13.255(a))).

As this authority demonstrates, the comprehensive regulatory framework that the State established "as a substitute for competition," TEX. WATER CODE § 13.001(b)(3), is a sufficient expression of Texas's "policy to displace federal antitrust law" in this field, *Phoebe Putney*, 568 U.S. at 229. That is, "the displacement of competition was the inherent, logical, or ordinary result of the exercise of authority delegated by the state legislature" to water utilities granted a CCN, such that the Water Code reflects that Texas "fore[saw] and implicitly endorsed [ ] anticompetitive effects as consistent with its policy goals." *Id.*

Take, for example, that Plaintiffs' Sherman Act claims are based on allegations that the applicable agreement between the City and JCSUD "purports to grant Mansfield a right to veto the provision of water services to Plaintiffs and others within the JCSUD service area in the City's ETJ." Dkt. No. 1, ¶ 95.

According to Plaintiffs, this agreement itself is a basis to deny dismissal on

state-action immunity:

> In the Water Agreement, the City and JCSUD agreed, despite JCSUD's statutory obligations to service all consumers within its certified area under Texas Water Code Section 13.250(a), that JCSUD would not supply retail water within Mansfield's ETJ without first obtaining its consent. In conflict with the Water Code, the City therefore has obtained the "sole discretion" to deny water services to consumers within the certified area. The City acquired this monopoly power via a private agreement, and not as the result of any affirmatively stated policy of the State of Texas or the utility commission. And, in violation of the Water Code, the City has since exercised its monopoly power to repeatedly obstruct and deny service to a consumer within the certified area of JCSUD – the Plaintiffs.

> The City's state action immunity argument therefore directly conflicts with several provisions of the Water Code. The Water Agreement violates JCSUD's statutory obligations which guarantee consumers the supply of water within certified areas. The Texas Legislature has not clearly articulated and affirmatively expressed a state policy authorizing the City to regulate or control the supply of water within JCSUD's CCN. Nor has the State authorized the City to decide in its "sole discretion" whether JCSUD should supply water to the Property. In derogation of its statutory duty, JCSUD has refused to supply Plaintiffs with water because the City has not consented. The City therefore has achieved exclusive control, *i.e.*, unlawfully obtained and exercised monopoly power, over retail water supply in the ETJ and in JCSUD's CCN area via a private contractual agreement, not as the result of any stated policy of the Legislature. There is no state action immunity for conduct of this sort that contradicts, rather than advances any State policy.

Dkt. No. 12 at 28-29.

But this argument fails to persuade to the extent that it engages with one provision of a regulatory scheme that the Texas Legislature enacted to displace competition.

This argument is also unpersuasive considering that "[a]nticompetitive [behavior is] a foreseeable result of the State's explicit grant of broad authority," *Claiborne*, 693 S.W.3d at 707, to utilities to act as "monopolies in the areas they

serve," TEX. WATER CODE § 13.001(b)(1); *accord Hallie*, 471 U.S. at 42 ("[I]t is clear that anticompetitive effects logically would result from this broad authority to regulate." (citation omitted)).

And, to the extent that Plaintiffs argue that the agreement essentially affords the City veto power outside the area that it serves and thus the power to interfere with their right to water from JCSUD, as the Fifth Circuit recently explained, the Water Code provides a solution: "If the utility fails to provide water or sewer service to a landowner within its CCN, the landowner may, under section 13.2541 of the Water Code, petition the PUC for expedited release of its land from the CCN." *Dobbin*, 108 F.4th at 323 (cleaned up); *see, e.g.*, Dkt. No. 1, ¶ 12 (Plaintiffs "have filed proceedings before the Texas Public Utility Commission to compel JCSUD to provide retail water service for the Cipriani Development.").

And, as a further reflection of the legislative choice to supplant competition, the Water Code then provides that, "[i]f the petition is granted, the utility is entitled to compensation for the loss of its monopoly rights in an amount determined by an independent appraiser." *Dobbin*, 108 F.4th at 323 (cleaned up).

And Plaintiffs may have other remedies.

But, for the reasons set out above, those do not include claims under the Sherman Act against the City. *Cf.* Dkt. No. 13 at 13 ("At most, Plaintiffs allege Mansfield somehow interfered with Plaintiffs' ability to obtain water service. However, even accepting that bald assertion as true, it has nothing to do with the articulated harms to competition, even if it occurred just as Plaintiffs assert." (cleaned

up)).

And, because the Court should dismiss the federal causes of action, the only "independent basis of subject matter jurisdiction," *Atkins*, 2023 WL 2658852, at *2, the Court should also grant the City's request that it decline to exercise supplemental jurisdiction over the remaining state law claims, because the balance of Section 1367(c)'s statutory factors and *Cohill*'s "common law factors of judicial economy, convenience, fairness, and comity" favor this result. *Enochs*, 641 F.3d at 159.

## Recommendation

The Court should grant in part and deny in part Defendant City of Mansfield, Texas's motion to dismiss Plaintiffs Megatel Homes, LLC and Cipriani Island Laguna Azure LLC's complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) [Dkt. No. 7] insofar as the Court should deny dismissal for lack of subject-matter jurisdiction but grant dismissal of Plaintiffs' Sherman Act claims under the City's state-action immunity and, as a result, decline to exercise supplemental jurisdiction over the remaining state law claims.

A copy of these findings, conclusions, and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions, and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions, and recommendation

where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

      DATED: August 6, 2025

                                _____

                                DAVID L. HORAN
                                UNITED STATES MAGISTRATE JUDGE